# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Interim HealthCare of Pittsburgh : 
and Sedgwick Claims Management : 
Services, Inc., : 
                        Petitioners : 
                         : 
          v. :   No. 789 C.D. 2018
                         :   Submitted: September 7, 2018
Workers' Compensation Appeal : 
Board (Pavis), : 
                        Respondent :

BEFORE:   HONORABLE P. KEVIN BROBSON, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge

*OPINION NOT REPORTED*

**MEMORANDUM OPINION**
**BY JUDGE BROBSON**         **FILED: February 21, 2019**

Interim HealthCare of Pittsburgh and Sedgwick Claims Management Services, Inc. (collectively, Employer) petition for review of an order of the Workers' Compensation Appeal Board (Board), dated May 15, 2018. The Board affirmed the decision of a Workers' Compensation Judge (WCJ), granting the claim petition filed by Susan Pavis (Claimant). For the reasons set forth below, we affirm the Board's order.

Claimant worked for Employer as a private-duty nurse. On December 30, 2014, Claimant sustained a work-related injury in the nature of a right upper arm and upper back strain. Employer accepted liability for Claimant's

work-related injury pursuant to a medical-only Notice of Compensation Payable. Thereafter, on July 17, 2015, Claimant filed a claim petition, asserting that she had sustained an injury to her right upper arm and upper back while working for Employer on December 30, 2014, and was disabled as of July 8, 2015.

Before the WCJ, Claimant testified that she worked for Employer as a private-duty nurse, providing care to patients within their homes. (Reproduced Record (R.R.) at 23a-24a.) In mid-November 2014, Claimant began to experience a twinge in the middle of her back while performing stretching exercises with one of her patients. (*Id.* at 27a.) Claimant explained that the patient is very stiff and has limited range of motion, and, therefore, she is required to raise the patient's leg and lean into the leg using force and her body weight to stretch out the patient's muscles. (*Id.* at 27a-28a.) By December 30, 2014, Claimant could no longer perform the stretching exercises with her patient because she was experiencing "extreme burning in the middle of [her] back[,] . . . muscle tightness and spasms throughout [her] upper back thoracic area into [her] shoulder and up into [her] neck[,] . . . [and] pain radiating down [her] arm like an electrical pain" on her right side. (*Id.* at 26a-29a.) As a result, Claimant reported her symptoms/injury to Employer and sought treatment for her injuries. (*Id.* at 29a.)

Claimant initially treated for her work-related injury with MedExpress. (*Id.* at 30a.) The medical professionals at MedExpress diagnosed Claimant with a muscle strain to the upper back and neck, prescribed Flexeril, and placed Claimant under a 10-pound lifting restriction. (*Id.* at 30a, 33a, 45a.) While working under the restriction, Claimant continued to care for the same patient, but she did not perform the range of motion/stretching exercises or reposition the patient. (*Id.* at 31a, 160a-61a.) During that time, Claimant continued to experience burning in her back

2

and muscle tightness and knotting throughout her shoulder. (*Id.* at 31a.) As a result, the medical professionals at MedExpress referred Claimant to Jacob Dicesare, D.O., an orthopedic doctor, who administered trigger point injections to Claimant's muscles and permitted Claimant to continue to work in a light-duty capacity. (*Id.* at 30a-31a, 46a-47a.) Claimant explained, however, that the trigger point injections were "[n]ot really effective." (*Id.* at 31a.) Claimant also treated with Joseph Altier, D.C., a chiropractor, who performed adjustments, heat therapy, massage therapy, and ultrasound therapy to her rib at the T5-T6 area. (*Id.* at 31a-32a.) Claimant explained that, with the chiropractic care, her muscle tightness slowly started to relax and her muscle knotting and spasms started to improve. (*Id.* at 32a.) Thereafter, in April/May 2015, Claimant began treating with Edward D. Snell, M.D. (*Id.* at 33a-34a.) At that time, Dr. Snell prescribed physical therapy, ordered an MRI and bone scan, and recommended that Claimant continue to undergo chiropractic treatment for her rib if necessary. (*Id.* at 33a.) Dr. Snell also prescribed Neurontin for nerve pain and continued Claimant's prescription for Flexeril. (*Id.*)

Claimant testified further that, despite the modified-duty restrictions, her symptoms did not improve; she continued to experience burning in her back, which became worse with lifting, muscle spasms, muscle tightness and knotting, and nerve pain down her right arm and up into her neck. (*Id.* at 34a, 36a-37a.) As a result, Dr. Altier, and later Dr. Snell, restricted Claimant from working in any capacity. (*Id.* at 35a-36a.) Claimant continued to treat with Dr. Altier until approximately 2 weeks later, when her "rib stayed where it was supposed to be" and no longer required adjustment. (*Id.* at 37a.) Claimant also continued to treat with Dr. Snell and to undergo physical therapy. (*Id.* at 37a-38a.) Claimant testified that

3

her symptoms improved while she was off from work, but she continued to experience burning pain in her back with lifting. (*Id.* at 38a.)

On October 9, 2015, based on the results of Claimant's functional capacity evaluation and his evaluation of Claimant, Dr. Snell released Claimant to return to work in a sedentary capacity. (*Id.* at 73a-74a.) Thereafter, on October 13, 2015, Claimant returned to work in a modified-duty position in Employer's office. (*Id.* at 74a-76a.) Claimant explained that she continues to experience a burning sensation/pain "in the center of [her] back just to the right" every day, a burning/aching "pain that radiates out underneath [her] shoulder blade on the right" that "comes and goes" and seems to be exacerbated with lifting, pulling, or pushing, and "numbness or tingling down underneath [her] right arm" on a rare occasion. (*Id.* at 79a, 151a-53a.) Claimant explained further that she also continues to experience increased pain while performing certain tasks in Employer's office, but she has the ability to vary those tasks to limit her discomfort. (*Id.* at 147a-48a.) As of September 14, 2016, Dr. Snell continued to restrict Claimant to "light duty, no lifting over [10] pounds and no repetitive movements with [her] right arm." (*Id.* at 188a.)

Claimant also presented the deposition testimony of Dr. Snell, who is board certified in family medicine with a certificate of added qualifications in sports medicine. (*Id.* at 228a.) Dr. Snell testified that he first treated Claimant on April 10, 2015. (*Id.* at 231a.) At that time, Claimant presented with "tenderness over the scapular thoracic region right over the rib cage and along the scapular thoracic articulation." (*Id.* at 233a.) Dr. Snell performed a physical examination, which revealed tenderness over the T5-T6 area and the parascapular region, a burning sensation over the muscles that control the parascapular region, a clicking

4

and catching sensation with scapular movement over the ribs, normal range of motion, no significant atrophy or muscle damage, normal strength, and normal sensation and reflexes. (*Id.* at 234a-35a, 249a-50a.) Dr. Snell ordered an MRI and a SPECT bone scan to determine whether Claimant had sustained any structural damage. (*Id.* at 233a.) The MRI revealed a small central herniation in the lower thoracic spine, but the bone scan was negative. (*Id.* at 234a.)

Dr. Snell testified further that, over the course of his treatment of Claimant, Claimant's complaints and physical examinations have been very consistent. (*Id.* at 235a.) Dr. Snell has sent Claimant for injections—an epidural, trigger point injections, and scapular thoracic injections—and, while the injections have helped Claimant's pain, they have not cured it. (*Id.* at 235a, 237a.) Dr. Snell has also prescribed physical therapy in an attempt "to try to mobilize the scapular area and stabilize the muscles around the area." (*Id.* at 236a.) Dr. Snell explained that Claimant received the most relief from her symptoms when he restricted her from working and that, as soon as Claimant returns to her work activities, her symptoms recur because she is required "to use her upper extremity and her scapular thoracic region and her articulation." (*Id.*) Dr. Snell explained further that, while he has been able to control Claimant's pain, he has not "been able to fix her." (*Id.* at 238a.) Dr. Snell also indicated that Claimant is very frustrated because she wants to go back to full-duty work, "but every time she does go back to any kind of duty, she gets [an] increase in her pain." (*Id.*)

In September 2015, Dr. Snell ordered a functional capacity evaluation to determine what Claimant could do that would not exacerbate her symptoms. (*Id.* at 238a.) Following the functional capacity evaluation, Dr. Snell released Claimant to return to work in a sedentary capacity. (*Id.* at 239a.) Dr. Snell explained

that any time Claimant does anything that involves movement of her shoulder with increased weight she experiences pain. (*Id.*) Dr. Snell also indicated that although Employer's office position causes Claimant to experience some pain, "it doesn't cause enough pain that it disables [Claimant]." (*Id.* at 239a-40a.) When questioned whether he discussed going back to direct patient care work with Claimant, Dr. Snell stated:

> [I]t's tenuous because she's frustrated. She wants to go back to full work, and she wants me to say that she's going to have no pain doing it, but I can't do that. She has an injury that's very difficult to treat because there's no surgical fix for it and the treatment that we use is very temporary. So it's something that she's stuck with, unfortunately.

(*Id.* at 240a-41a.)

Ultimately, Dr. Snell opined that Claimant sustained a scapular thoracic articulation and chronic thoracic pain as a result of her work activities. (*Id.* at 243a.) Dr. Snell did not believe that Claimant's pain would ever be resolved and that the pain is something that Claimant will just have to deal with, similar to having to deal with arthritis. (*Id.*) Dr. Snell indicated that Claimant should continue to work under her current sedentary/office work restrictions with no lifting greater than 10 to 20 pounds because, if Claimant attempts to do anything with a significant amount of weight, including reaching, pushing, pulling, and lifting, Claimant is going to experience pain. (*Id.* at 243a-44a.)

On cross-examination, Dr. Snell admitted that, objectively and based on the results of the functional capacity evaluation, Claimant is capable of performing light-duty work, including the modified-duty positions offered to her by Employer. (*Id.* at 251a-55a.) More specifically, Dr. Snell testified:

> Q.   . . . Now, let me ask you this: Certainly from an objective standpoint you've indicated she could do these

6

jobs. I'm assuming if she came to you and said, "Doctor, I want to try these jobs," you'd let her?

A. I would.

Q. You'd even encourage her to at least try these jobs; wouldn't you?

A. I would.

Q. And at least objectively, Doctor -- again, objectively, she's capable of working as a nurse. It's just her pain complaints that are limiting her?

A. That's correct.

(*Id.* at 256a-57a.)

In opposition to Claimant's claim petition, Employer presented the deposition testimony of Thomas D. Kramer, M.D., an orthopedic surgeon. (*Id.* at 314a.) Dr. Kramer performed an independent medical examination of Claimant on October 19, 2015, which included obtaining a history, reviewing Claimant's medical records, and performing a physical examination. (*Id.* at 317a-24a.) Dr. Kramer opined that Claimant sustained a work-related thoracic strain on December 30, 2014, and that Claimant had fully recovered from such injury and required no further treatment or work restrictions as of the date of his independent medical examination. (*Id.* at 327a-28a.) Dr. Kramer also indicated that there was no explanation for Claimant's pain complaints. (*Id.* at 328a.) Dr. Kramer further opined that Claimant was capable of: (1) performing the modified-duty positions offered to her by Employer; (2) obtaining her cardiopulmonary resuscitation (CPR) recertification; and (3) resuming her pre-injury position as a home health nurse. (*Id.* at 328a-30a.)

Employer also presented the testimony of Aimee Bergamasco, Employer's client service manager. (*Id.* at 85a-86a, 101a-02a.) In her position as client service manager, Ms. Bergamasco is responsible for scheduling employees for

7

modified-duty work within their restrictions. (*Id.* at 86a.) Ms. Bergamasco testified that, following Claimant's release to sedentary work in October 2015, Employer provided Claimant with a position in its office, answering phones, filing, typing, and moving files. (*Id.* at 87a, 103a-04a.) Ms. Bergamasco explained, however, that Employer wanted to get Claimant back to work in the field treating patients because Claimant is an excellent nurse. (*Id.* at 104a.) As a result, in November 2015, Employer offered Claimant a modified-duty position as a pediatric nurse. (*Id.* at 104a-05a.) The position would have required Claimant to provide personal care to a 6-month-old child, including changing the child's diapers, providing feedings to the child through a gastrointestinal tube, suctioning the child's trachea tube, and turning and lifting the child. (*Id.* at 104a-05a, 120a.) In the event of an emergency, such as choking or respiratory distress, Claimant may have been required to lift/carry the child and/or perform CPR. (*Id.* at 115a-16a, 122a.) Claimant refused the position, and Employer thereafter received a letter from Dr. Snell dated December 9, 2015, restricting Claimant to in-office work only. (*Id.* at 105a-06a.)

Ms. Bergamasco testified further that, in January 2016, Employer offered Claimant a second modified-duty position, which involved assisting a 7-year-old wheelchair-bound child during transportation to and from school on the school bus. (*Id.* at 107a.) Ms. Bergamasco explained that there would have been two other nurses on the school bus that could have assisted Claimant if she had difficulty pushing the wheelchair onto the lift. (*Id.* at 108a.) She admitted, however, that if those nurses would have been busy attending to their patients, they would not have been able to assist Claimant. (*Id.* at 124a-25a.) She also explained that Claimant would not have been required to provide care to the child while at school;

8

once the child was at school, the school bus driver would have taken Claimant home and then picked her up before returning to the school at the end of the day. (*Id.*) Claimant did not accept the second modified-duty position. (*Id.* at 109a.) Thereafter, Ms. Bergamasco advised Claimant of a third modified-duty position, which involved providing care to a 17-year-old diabetic child. (*Id.* at 109a-10a.) The position would have required Claimant to be present with the child during the school day and to check the child's blood sugar at lunch. (*Id.* at 110a, 126a-27a.) In the event of a diabetic crisis, Claimant may have been required to catch the child if the child passed out or to lower the child to the ground. (*Id.* at 127a-28a.) Ms. Bergamasco explained that there would be individuals available to assist Claimant on the bus if necessary, but that, during the school day, only the school nurse would be available to provide assistance. (*Id.* at 111a-12a, 128a.) Claimant did not accept the third modified-duty position. (*Id.* at 112a.)

Ms. Bergamasco admitted that Claimant's limitations are preventing her from doing more than the office position. (*Id.* at 113a-14a.) Ms. Bergamasco also admitted that Employer did not contact the children's parents to determine whether they would consent to Claimant providing care to their children given her physical limitations. (*Id.* at 116a-20a, 133a-34a.) She explained that, before Employer would have contacted the children's parents, Claimant would have had to accept one of the positions, and, in this case, Claimant refused all of them. (*Id.* at 132a-34a.) Ms. Bergamasco further admitted that Claimant would have to be CPR-certified to perform any of the nursing positions offered to her by Employer. (*Id.* at 122a-24a.)

On rebuttal, Claimant testified that she discussed the modified-duty position as a pediatric nurse and the modified-duty position involving the 7-year-old

9

wheelchair-bound child with Dr. Snell. (*Id.* at 148a-50a.) Following her discussions with Dr. Snell, Claimant decided not to try to perform either of the modified-duty positions. (*Id.* at 150a.) Claimant explained that "any patient care that was going to require any lifting, restraining, pushing or pulling of the patient, or equipment was outside of [her] ability" and Dr. Snell "did not want [her] doing [it]." (*Id.*) Claimant testified further that she also did not attempt to perform the third modified-duty position involving a 17-year-old diabetic child because, in her experience, she would be required to assist the child in the event of a crisis—*e.g.*, perform CPR or provide assistance if the child faints—which she is unable to do. (*Id.* at 151a.) Claimant also testified that she was unable to complete her CPR recertification because she could not perform the compressions without putting pressure on her back. (*Id.* at 153a-54a, 166a.) She explained that she was not capable of demonstrating proper CPR technique because she could not use both hands to push with enough force to compress the chest of an adult patient 2 full inches for a period of 2 minutes. (*Id.* at 153a-56a.)

On January 20, 2017, the WCJ issued a decision and order, granting Claimant's claim petition.[1] In so doing, the WCJ made the following relevant findings of fact and credibility determinations:

> 24. [Claimant], based on the credible and persuasive testimony of Dr. Snell, her treating physician, sustained a thoracic scapular articulation as a result of her work injury that resulted in total disability from July 8, 2015, through and including October 12, 2015 and in partial disability since October 13, 2015, when [Claimant] returned to

---

[1] On January 31, 2017, the WCJ issued an amended order, whereby the WCJ corrected a typographical error in her January 20, 2017 decision—*i.e.*, she changed the date on which Claimant's partial disability benefits would begin from October 13, 2013, to October 13, 2015. The WCJ affirmed her January 20, 2017 decision and order in all other respects.

10

work at modified duties at reduced wages. . . . Dr. Snell testified that [Claimant] was not limited by her objective physical findings. He opined that she was limited by her pain resulting from using her upper extremity, scapular thoracic region, and articulation causing her symptoms to reoccur. . . . Dr. Snell credibly testified that [Claimant] was unable to return to any nursing work since [Claimant] would have pain whenever she tries to do anything with a significant amount of weight. He took her off work beginning July 8, 2015. Dr. Snell released [Claimant] to sedentary duty work not lifting more than 10-pounds at her October 9, 2015, visit after reviewing the results of her functional capacity evaluation. Dr. Snell testified that, since [Claimant] continued to have pain with activities using her right arm, he had not released her to return to work at [3] nursing positions. He admitted that he would encourage her and release her to the modified nursing position if she wanted to try the position. Dr. Snell did not release [Claimant] to try the [3] nursing positions based on her pain complaints generated by her current activities.

25. Dr. Kramer's opinion that [Claimant] sustained a thoracic strain as a result of the work incident and had fully recovered the thoracic strain and was able to return to work without restrictions as of October 19, 2015, was not credible or persuasive. . . .

26. This [WCJ] finds that the [3] modified nursing positions did not fall within [Claimant's] existing physical restrictions related to her December 30, 2014, work injury. Ms. Bergamasco never provided the weight of the [6-month-old] infant, which [Claimant] would have to pick up and/or move at times. Although [Claimant] did not have to remain with the [7]-year-old child while the child was in school, [Claimant] was to stay with this child after school until the mother returned. Ms. Bergamasco did not indicate what assistance this child would require if she needed to go to the bathroom. She admitted that [Claimant] may need

11

to assist the 17-year-old diabetic to lay down if the 17-year-old had a diabetic crisis. Ms. Bergamasco did not establish that assistance for [Claimant] was available while this student was in school. She only mentioned that [2] other nurses were available on the school bus. Ms. Bergamasco did not indicate if these nurses stayed at the school with their patients. Finally, [Employer] had not informed the parents of the children and the teenager of [Claimant's] physical restrictions. [Employer] did not know if the parents would consent to having [Claimant] as their nurse once the parents were aware of her limitations.

(WCJ's Decision at 14-16.) Based on these findings of fact and credibility determinations, the WCJ concluded: (1) Claimant sustained a thoracic scapular articulation as a result of her December 30, 2014, work-related incident; (2) as a result of her December 30, 2014 work-related injury, Claimant has been unable to perform her pre-injury job as a private-duty nurse since July 8, 2015, when Dr. Snell took her off of work; and (3) Claimant's disability changed from total disability to partial disability on October 13, 2015, when she returned to work on modified duty. Employer appealed to the Board, which affirmed the WCJ's decision. Employer then petitioned this Court for review.

On appeal,[2] Employer is essentially arguing that there is not substantial evidence of record to support the WCJ's finding that the 3 modified-duty nursing positions offered by Employer did not fall within Claimant's existing work restrictions, and, therefore, Employer is entitled to a suspension of benefits because

---

[2] Our review is limited to determining whether an error of law was committed, whether necessary findings of fact are supported by substantial evidence, and whether constitutional rights were violated. *Combine v. Workers' Comp. Appeal Bd. (Nat'l Fuel Gas Distrib. Corp.)*, 954 A.2d 776, 778 n.1 (Pa. Cmwlth. 2008), *appeal denied*, 967 A.2d 961 (Pa. 2009).

Claimant did not follow through on such positions in good faith.[3] More specifically, Employer argues that the record contains evidence that the 3 modified-duty nursing positions were within Claimant's restrictions and actually available to Claimant, because Dr. Snell, Claimant's treating physician, whose testimony the WCJ found credible, testified that he would encourage Claimant to perform the 3 modified-duty nursing positions. Employer argues further that, by considering such factors as the weight of the 6-month-old infant, whether the 7-year-old wheelchair-bound child would need assistance to go to the bathroom, whether assistance would be available at the school to assist her with the 17-year-old diabetic teenager, and whether the parents of such children would consent to Claimant providing care to their children, the WCJ went beyond her discretion and considered factors that Claimant did not raise in her testimony. In response, Claimant argues that the WCJ's finding that the 3 modified-duty nursing positions did not fall within her existing work restrictions is supported by substantial evidence, and, therefore, Claimant could not

_____

[3] Employer also suggests that the WCJ failed to issue a reasoned decision and capriciously disregarded evidence of record because the WCJ did not explain why, in light of Dr. Snell's credible testimony that he would encourage Claimant to try to perform the 3 modified-duty nursing positions, she found that such positions were not within Claimant's work restrictions. Employer, however, did not fully develop these arguments in its brief to this Court as required by Pennsylvania Rule of Appellate Procedure 2119 and, therefore, such arguments have been waived. *See City of Phila. v. Workers' Comp. Appeal Bd. (Calderazzo)*, 968 A.2d 841, 846 n.4 (Pa. Cmwlth.), *appeal denied*, 980 A.2d 609 (Pa. 2009). In addition, based on our review of the WCJ's decision, we cannot conclude that the WCJ failed to issue a reasoned decision because the WCJ explained the rationale behind her decision such that we can exercise adequate review. *See Amandeo v. Workers' Comp. Appeal Bd. (Conagra Foods)*, 37 A.3d 72, 76 (Pa. Cmwlth. 2012). We also cannot conclude that the WCJ capriciously disregarded evidence of record because the WCJ did not deliberately ignore Dr. Snell's testimony that he would encourage Claimant to try to perform the 3 modified-duty nursing positions; rather, the WCJ considered such testimony as part of her decision. *See Williams v. Workers' Comp. Appeal Bd. (USX Corp.-Fairless Works)*, 862 A.2d 137, 144 (Pa. Cmwlth. 2004) ("Capricious disregard occurs only when the fact-finder deliberately ignores relevant, competent evidence.").

13

have acted in bad faith by failing to follow through on the job referrals. More specifically, Claimant argues that Dr. Snell did not release Claimant to perform any of the 3 modified-duty nursing positions due to the pain Claimant continued to experience with her current activities. Instead, in response to an objective hypothetical posed to him during cross-examination, Dr. Snell stated that he would encourage Claimant to perform the 3 modified-duty nursing positions *if* she wanted to try to perform such positions.

At the outset, we note that it is well settled that the WCJ is the sole arbiter of credibility and evidentiary weight. *Womack v. Workers' Comp. Appeal Bd. (Sch. Dist. of Phila.)*, 83 A.3d 1139, 1154 (Pa. Cmwlth.), *appeal denied*, 94 A.3d 1011 (Pa. 2014). In determining whether the WCJ's findings are supported by substantial evidence, we may not reweigh the evidence or the credibility of the witnesses but must simply determine whether the WCJ's findings have the requisite measure of support in the record as a whole. *Elk Mountain Ski Resort, Inc. v. Workers' Comp. Appeal Bd. (Tietz, deceased)*, 114 A.3d 27, 32 n.5 (Pa. Cmwlth. 2015). It is irrelevant whether there is evidence to support a contrary finding; if substantial evidence supports the WCJ's necessary findings, we may not disturb those findings on appeal. *Williams*, 862 A.2d at 143-44.

It is also well settled that "[i]n a proceeding on a claim petition, the claimant bears the burden of establishing a work-related injury rendering the claimant incapable of performing the time-of-injury job." *Vista Int'l Hotel v. Workmen's Comp. Appeal Bd. (Daniels)*, 742 A.2d 649, 654 (Pa. 1999). If, however, as part of the claim petition proceedings, the employer seeks a suspension of benefits and "asserts that the claimant can perform some work within restrictions, the employer bears the burden of proving that suitable employment is available." *Id.*

14

An employer seeking a suspension of benefits on the basis that the claimant has recovered some or all of her ability to work, must produce: (1) credible medical evidence establishing that the claimant's physical condition has changed; and (2) evidence that the employer referred the claimant to a then-available job that the claimant is capable of performing based on her medical clearance. *Kachinski v. Workmen's Comp. Appeal Bd. (Vepco Constr. Co.)*, 532 A.2d 374, 380 (Pa. 1987). The burden then shifts back to the claimant to demonstrate that she followed through on the job referral in good faith. *Id.* In the event that the referral does not result in a job, the claimant's benefits should continue. *Id.*

Here, the WCJ considered all of the evidence presented to her and essentially found that Employer failed to demonstrate that Claimant was capable of performing the 3 modified-duty nursing positions. In making this finding, the WCJ recognized that Employer failed to establish: (1) the weight of the 6-month-old child, which Claimant would be required to lift at times; (2) what assistance, if any, the 7-year-old wheelchair-bound child would need at home after school if the child needed to go to the bathroom; (3) whether Claimant would have assistance at the school in the event that the 17-year-old diabetic child had a diabetic crisis; and/or (4) whether the children's parents would consent to Claimant providing care to their children given Claimant's physical limitations. The WCJ, as the finder of fact, was free to consider Employer's failure to present evidence on these issues. Contrary to Employer's allegations, the WCJ did not "venture[] into the realm of unreasonableness" by taking these issues into consideration even though Claimant did not address these issues in her testimony because Employer, not Claimant, had the burden to establish its entitlement to a suspension of benefits in this case. *See Vista Int'l Hotel*, 742 A.2d at 654. In order to establish that it was entitled to a

15

suspension of benefits in this case, Employer was required to establish that the modified-duty positions were within Claimant's restrictions and that the modified-duty positions were available to Claimant. By failing to present evidence of the issues identified above, Employer could not meet its burden of proof because Employer could not establish that the modified-duty positions were within Claimant's restrictions or that the modified-duty positions were available to Claimant. *See Kachinski*, 532 A.2d at 380. In addition, even though Dr. Snell admitted on cross-examination that Claimant was objectively capable of performing the modified-duty positions, that Claimant's pain complaints were what was limiting her ability to perform the modified-duty positions, and that he would encourage Claimant to perform the modified-duty positions, Dr. Snell continued to restrict Claimant to sedentary/office work with no lifting greater than 10 to 20 pounds. Dr. Snell also indicated that he was unable to relieve Claimant's pain and that he believed that Claimant's thoracic pain was chronic and would never resolve. For these reasons, we conclude that there is substantial evidence of record to support the WCJ's finding that the 3 modified-duty nursing positions offered by Employer did not fall within Claimant's existing work restrictions.

Accordingly, we affirm the Board's order.

P. KEVIN BROBSON, Judge

16

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Interim HealthCare of Pittsburgh     :
and Sedgwick Claims Management    :
Services, Inc.,                             :
                  Petitioners    :
                                   :
           v.                   :    No. 789 C.D. 2018
                                   :
Workers' Compensation Appeal     :
Board (Pavis),                         :
                  Respondent    :

# O R D E R

AND NOW, this 21st day of February, 2019, the order of the Workers' Compensation Appeal Board is hereby AFFIRMED.

_____
P. KEVIN BROBSON, Judge